1

2

3

4

5

6

7

8            **UNITED STATES DISTRICT COURT**

9              EASTERN DISTRICT OF CALIFORNIA

10

11   ANDREW A. CEJAS,                          Case No. 1:12-cv-00271-AWI-DLB PC

12              Plaintiff,                      FINDINGS AND RECOMMENDATIONS
                                                REGARDING MOTION FOR SUMMARY
13        v.                                    JUDGMENT FILED BY DEFENDANTS
                                                MYERS, TRIMBLE, McGEE AND FISHER
14   MYERS, et al.,
                                                (Document 132)
15              Defendants.

16

17        Plaintiff Andrew A. Cejas ("Plaintiff") is a California state prisoner proceeding pro se and in

18   forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding on

19   Plaintiff's Third Amended Complaint for violation of his First Amendment right to practice his

20   religion against Defendants.

21        On January 11, 2016, Defendants Myers, Trimble, McGee and Fisher filed a motion for

22   summary judgment.[1]  Plaintiff filed various documents opposing the motion, filing a main

23   opposition on March 17, 2016.  Defendants filed their reply on March 24, 2016.  On April 8, 2016,

24   Plaintiff filed a late response to Defendants' statement of undisputed facts, and he filed additional

25   briefing on April 11, 2016.  The motion is ready for decision pursuant to Local Rule 230(l).[2]

26   ///

27

28   ───────────────────────
     [1]  Defendants Foston, Van Leer and Pimentel are represented by different counsel and have filed their own motion for
     summary judgment.  The Court will address that motion by separate Findings and Recommendations.

     [2]  Defendants provided the requisite notice required by *Rand v. Rowland*, 152 F.3d 952, 961-963 (9th Cir. 1998).

## I.   **LEGAL STANDARD**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).  The Court may consider other materials in the record not cited to by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case.  *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)).  If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  *In re Oracle Corp.*, 627 F.3d at 387 (citing *Celotex Corp.*, 477 U.S. at 323).  This requires Plaintiff to "show more than the mere existence of a scintilla of evidence."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty PayLess, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566 (2012).  The Court determines only whether there is a genuine issue for trial, and Plaintiff's

1   filings must be liberally construed because he is a pro se prisoner.  *Thomas v. Ponder,* 611 F.3d

2   1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

3   **II.      SUMMARY OF PLAINTIFF'S ALLEGATIONS**

4           Plaintiff is incarcerated at the R.J. Donovan Correctional Facility.  The events at issue

5   occurred while Plaintiff was incarcerated at Pleasant Valley State Prison ("PVSP").

6           Plaintiff explains that he is a sincere practitioner of the Buddhist faith, which requires

7   meditation, chanting and prostration in an indoor space.  Prisoners use the chapel space as a

8   "monastery," where they can learn meditation techniques from more advanced prisoners or

9   volunteers.  Plaintiff contends that the denial of chapel access from 2009 through 2012 has burdened

10  the practice of his religious faith.

11          Plaintiff alleges that as of June 2008, PVSP Operations Manual Supplement section 10160

12  required that master chapel schedules be made to accommodate each religious group.  Defendant

13  Myers is responsible for preparing the monthly schedules.  Buddhists are afforded chapel time on

14  Mondays and Tuesdays from 1:00 p.m. to 4:00 p.m.

15          In 2009, Plaintiff was on C-status for 30 days.  Defendants Myers, Fisher, Trimble and

16  McGee were responsible for placing restrictions on C-status prisoners, and Plaintiff was not allowed

17  to attend Buddhist services during this time.

18          On December 20, 2010, Plaintiff filed a group appeal regarding the years of denial of chapel

19  access caused by Defendant McGee not arriving for scheduled services.  He contends that Defendant

20  McGee intentionally failed to provide chapel access from 2009 through 2012, which prohibited

21  Plaintiff from practicing his Buddhist faith.

22          On January 27, 2011, Defendants Myers and Trimble denied the appeal at the First Level,

23  stating that if there is no state chaplain or religious volunteer, inmates can gather on the recreational

24  yard.  Plaintiff explains that this is insufficient because of the risks of Valley Fever, as well as

25  dangers faced on the yard when an inmate's eyes are closed.

26          On April 4, 2011, Defendants Trimble and Myers denied the appeal at the Second Level,

27  stating that Plaintiff was allowed to participate in Buddhist services and that there is a staff member

28  designated to assist Buddhist members.

1    Defendant Trimble revised section 101060.8 on April 29, 2011, though it still required

2    custody staff to supervise chapel access in the absence of a chaplain or religious volunteer.

3    On July 19, 2011, Defendants Van Leer and Foston denied the appeal at the Director's Level,

4    stating that PVSP provided Plaintiff with a thorough response.

5    On August 9, 2011, Plaintiff submitted a group appeal because he was on C status again, and

6    was not allowed to attend group religious services.

7    Defendant Trimble denied the appeal at the Second Level, explaining that Plaintiff was

8    permitted to worship during his allotted program time based on his work group/privilege

9    designation.

10    On December 29, 2011, Defendant Pimentel and Foston denied the appeal at the Third Level,

11    citing section 3201(a) of Title 15 of the California Code of Regulations, which requires that the

12    institution make every reasonable effort to provide for the religious and spiritual welfare of inmates.

13    Plaintiff contends that Defendants Fisher, Trimble, Foston, Van Leer and Pimentel knew of

14    the violations and were in a position to correct them, but failed to do so.  From 2009 through 2012,

15    Defendants burdened the practice of Plaintiff's sincerely held religious beliefs by preventing chapel

16    access.  During this time, Jewish and Muslim inmates were permitted unsupervised chapel access, as

17    well as C-status chapel access.

18    **III.    UNDISPUTED MATERIAL FACTS[3]**

19    PVSP has a rated capacity of 2,308 inmates.  Between 2008 and 2012, PVSP was over

20    capacity, holding between 3,200 inmates and 3,500 inmates.  Fisher Decl. ¶ 8; Myers Decl. ¶ 7.

21    Around 2010, a hiring freeze mandated by the governor of California limited the ability of

22    PVSP to hire new personnel.[4]  Trimble Decl. ¶ 7; Fisher Decl. ¶ 8; Myers Decl. ¶ 3; McGee Decl. ¶

23    3.

24    ---

[3]  Plaintiff filed his own separate statement of disputed facts, though he did not specifically admit or deny the facts set

25    forth by Defendant as undisputed.  Local Rule 56-260(b).  Therefore, Defendants' statement of undisputed facts is accepted except where brought into dispute by Plaintiff's verified amended complaint or Plaintiff's declaration in support of his disputed facts.  ECF No. 161, at 20-27.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (verified

26    complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence).

27    [4]  Plaintiff attempts to create a disputed fact by arguing that prior to, and during, the hiring freeze, Defendants failed to hire new personnel to prevent a chaplain shortage.  However, Plaintiff's statement is based on speculation and lacks

28    personal knowledge.  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (declarations "must be made with personal knowledge; declarations not based on personal knowledge are inadmissible and cannot raise a genuine issue of material fact").

4

As a result of the hiring freeze and the fact that PVSP was above capacity, there was a relative shortage of correctional officers between 2009 and 2012.  Fisher Decl. ¶ 8.  This shortage of correctional officers placed strains on the allocation of personnel resources within the prison and made it difficult to accommodate the special requests of inmates, including C-status inmates subject to additional restrictions.[5]  Fisher Decl. ¶ 9.

*Facility A Chapel Access*

A correctional officer staff position was not assigned to supervise the Facility A chapel at PVSP.  Such position assignments were made at CDCR headquarters in Sacramento, and Defendants were not involved in any of the assignments.[6]  Trimble Decl. ¶ 9; Myers Decl. ¶ 6.

PVSP was supposed to have five chaplains in 2008, and as of 2008, there were five chaplains at PVSP.  Myers Decl. ¶¶ 2-3; McGee Dec. ¶ 3.  In July 2010, only two of the chaplain positions at PVSP were filled.  Trimble Decl. ¶ 7; Fisher Decl. ¶ 8; Myers Decl. ¶ 3; McGee Decl. ¶ 3.

Starting in 2012, Defendant McGee was the only chaplain at PVSP and was responsible for tending to the religious needs of over 3,200 inmates, with five separate yards and five separate chapels.[7]  Fisher Decl. ¶ 8, Myers Decl. ¶ 5; McGee Decl. ¶ 3.  The shortage of chaplains was attributable to the hiring freeze, not the action or inaction of any Defendant.  Trimble Decl. ¶ 7; Fisher Decl. ¶ 8, Myers Decl. ¶ 5; McGee Decl. ¶ 4.  Even though there were open positions in the religious program at PVSP, it was difficult to recruit people to work there.  Myers Decl. ¶ 3.  Both Defendant Myers and Defendant McGee also tried to get people to volunteer, but they were unsuccessful.  Myers Decl. ¶ 4; McGee Decl. ¶ 4.

---

[5]  Plaintiff disputes that there was a shortage of correctional officers and contends that the hiring freeze did not impact religious services.  He cannot create a dispute of fact, however, by simply disagreeing with Defendants' statements.  Plaintiff also cites Operations Procedure 107 in arguing that religious services were supposed to continue in accordance with the chapel schedule.  The policy states, however, that during staff shortages, impact to services shall be *kept to a minimum*.  ECF No. 23-5, at 3.

[6]  Plaintiff states that from 2009-2012, correctional officers were assigned to supervise the Facility A chapel, and that such decisions were made by Defendants.  To support his statement, he cites PVSP Departments of Operations Manual Section 101060.8.  Trimble Decl., Ex. A.  The section, entitled "Location and Use of Chapel," does not set out any staffing assignments, nor does Plaintiff have personal knowledge of how staffing assignments are made.  *Hexcel Corp.*, 681 F.3d at 1063.

[7]  Plaintiff states that Defendant McGee was not the only chaplain in 2012 because "they" hired a Native American chaplain and a Muslim chaplain.  He also states that Defendant McGee was not responsible for tending to the needs of all inmates because not all inmates participate in religious programs.  There is no indication, however, that Plaintiff has personal knowledge of such issues.  *Hexcel Corp.*, 681 F.3d at 1063.

One of Defendant McGee's responsibilities included supervising the Buddhist services in the Facility A chapel.  McGee Decl. ¶ 3.  There were occasions when he was unable to supervise chapel service.  McGee Decl. ¶ 3; Pl.'s Decl. ¶ 6.  The only times when Defendant McGee would not supervise the Facility A Buddhist inmates' time in chapel was when the program was cancelled by the custody staff, he had an unavoidable conflict in his duties, or he was not working at the time.  McGee Decl. ¶ 3.

Plaintiff's religious practices include reciting mantras approximately once per week, meditating approximately twice per day, chanting once or twice per month and reading the dharma (a collection of Buddhist teachings).  Pl.'s Dep. 32:2-35:25 (attached to Jeffrey Decl. as Ex. A).  There are individual and group components to his practice.  Pl.'s Decl. ¶ 1.  For his "group practice," Plaintiff engages in group meditation and chanting in the chapel every week, "when available by chapel schedule."  Pl.'s Decl. ¶ 1.  While Plaintiff can perform his individual practice in his cell, he cannot engage in group practice, i.e., group meditation and chanting, in his cell.  Pl.'s Decl. ¶ 2.  During chapel time, therefore, Plaintiff engaged in meditation and chanting.  Pl.'s Dep. 61:4-10.

Plaintiff and other inmates were able to chant and meditate in the yard when they were not able to access the chapel.  Pl.'s Dep. 45:23-25, 62:3-9, 64:1-23.  All practices that could be performed in the chapel could also be performed on the yard, and there was nothing about the yard that prevented inmates from meditating and chanting.[8]  Pl.'s Dep. 61:21-62:9.

For the safety of staff, other inmates and the institution, inmates are not permitted to use the Facility A chapel without supervision.[9]  Trimble Decl. ¶ 9; Fisher Decl. ¶ 11; Myers Decl. ¶ 9.

---

[8]  Plaintiff argues that the yard was not a safe place to meditate or chant because it was not safe for inmates to close their eyes, as recommended.  In his declaration, he states that he has witnessed stabbings, slicing and "a lot of blood pouring out of prisoners from 2008-2013."  Pl.'s Decl. ¶ 21.  However, Plaintiff testified that he could, and did, perform all the same religious practices on the yard that he would have performed in the chapel.  Pl.'s Dep. 61:22-62:9.

[9]  In attempting to dispute this fact, Plaintiff states that from 2009-2012, Defendants permitted Muslim and Jewish inmates to use the Facility A chapel without supervision.  Pl.'s Decl. ¶ 4.  To support his statement, he cites two institutional memoranda which indicate that in the absence of Jewish or Muslim chaplains, inmate representatives shall coordinate and lead the chapel services.  ECF No. 163, at 115, 123.  The documents do demonstrate, however, that Jewish and Muslim inmates were permitted to use the chapel without any supervision, as supervision could have been provided by non-chaplain staff.  Plaintiff also states that he "spoke" to Inmates Goldstein and Memefield "regarding the issue of unsupervised chapel access."  Pl.'s Decl. ¶ 4.  Plaintiff does not provide specifics about the conversations, however, and any such information would be inadmissible hearsay.  *See Jones v. Williams*, 791 F.3d 1023, 1032 (9th Cir. 2015) (citing Fed. R. Evid. 801(c)); *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (holding that it was an abuse of discretion for the district court, at the summary judgment stage, to consider information from an affidavit based on inadmissible hearsay rather than the affiant's personal knowledge).  The Court also notes that Plaintiff's equal protection claim was dismissed from this action.

6

*C-Status*

Inmates are placed on Confinement Status, or C-Status, by a Unit Classification Committee for repeated program failures, including receiving one or more Rules Violations Reports.  Trimble Decl. ¶ 2; Fisher Decl. ¶ 3.  Inmates may be placed on C-Status when they have demonstrated an unwillingness to comply with institutional regulations, and a Unit Classification Committee determines that they pose a threat to the institution.[10]  Trimble Decl. ¶ 2; Fisher Decl. ¶ 3.  The Unit Classification Committee also decides how long an inmate will remain on C-Status.  Cal. Code Regs. Tit. XV, §§ 3314-3315.

The restrictions placed on C-Status inmates are designed to limit their movements, as these inmates have been found to present a threat to the safety and security of prison staff, other inmates and/or the institution.  Trimble Decl. ¶ 2; Fisher Decl. ¶ 3.

Plaintiff was placed on C-Status for periods in 2009 and 2011.  Fisher Decl. ¶ 4, Ex. B and C; Pl.'s Dep. 56:14-57:15.  As a result of Plaintiff's placement on C-Status, he was not permitted to attend Buddhist group services for roughly five weeks in 2009, and four months in 2011.  Pl.'s Dep. 56:14-57:15.

C-Status inmates were permitted to attend the chapel times that were scheduled during their yard time, but they were not otherwise individually released from their cells to attend chapel times that did not coincide with their yard time.[11]  Trimble Decl. ¶ 2; Fisher Decl. ¶ 2, Ex. A.

C-Status inmates could receive religious consultations by submitting requests to religious leaders.[12]  Trimble Decl. ¶ 5; Fisher Decl. ¶ 6; McGee Decl. ¶ 7.  While Plaintiff was on C-Status, he never made a request for a religious consultation.  McGee Decl. ¶ 7; Pl.'s Dep. 42:6-43:11.  Rather, he elected to file a group appeal regarding chapel access.  Pl.'s Decl. ¶ 12.

---

[10]  Plaintiff disputes the fact that C-Status inmates are threat, simply stating that "from 2009 to 2012, C-Status prisoners did not pose a threat to the institution or security."  Pl.'s Decl. ¶7.  Plaintiff has no foundation on which to make such a statement, and his belief is purely speculative.  Such statements cannot create disputes of fact.

[11]  Plaintiff contends that a Jewish C-Status inmate, Loren Holsher, was individually released from his cell to attend chapel times that did not coincide with C-Status yard times.  He states that he has personal knowledge of the fact because they were in the same cell on C-Status.  Pl.'s Decl. ¶ 2.  Despite Plaintiff's claim of personal knowledge, he does not establish how he knew where inmate Holsher was going, or why he believed that he was going to chapel.  Moreover, as noted above, Plaintiff's equal protection claim was dismissed from this action.

[12]  Plaintiff speculates that because a Buddhist chaplain could not "show up to supervise chapel," a chaplain would not likely come to his cell.  Pl.'s Decl. ¶ 12.  His conclusion does not render the fact disputed.

1    Defendant Myers did not have any role in the implementation of the C-Status policy, nor did

2    she have anything to do with the decision to release inmates to chapel on a daily basis.[13]  Myers

3    Decl. ¶ 2.  Defendant McGee had no role in enacting or enforcing the C-Status policy at PVSP.

4    McGee Decl. ¶ 5.

5    While on C-Status, Plaintiff could still chant, meditate and read the dharma in his cell, or on

6    the yard during his scheduled yard time.  Trimble Decl. ¶ 5; Fisher Decl. ¶ 5; McGee Decl. ¶ 7.

7    Although Defendant Trimble's pre-printed signature appeals on Second Level Appeal, Log

8    No. PVSP-11-01228 and Second Level Appeal, Log No. PVSP-11-00006, he did not review or sign

9    either appeal.[14]  Trimble Decl. ¶¶4, 8.

10   Defendant Fisher did not work at PVSP during 2009.[15]  Fisher Decl. ¶ 1.

11   **IV.    DISCUSSION**

12        A.    Legal Standard

13   The First Amendment provides that "Congress shall make no law respecting an establishment

14   of religion, or prohibiting the free exercise thereof."  U.S. Const., amend. I.  Prisoners "retain

15   protections afforded by the First Amendment," including the free exercise of religion.  *O'Lone v.*

16   *Estate of Shabazz*, 482 U.S. 342, 348 (1987).  The free exercise right is necessarily limited by the

17   fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to

18   maintain prison security.  *Id.* at 348-49.  However, prison officials are not permitted to place

19   substantial burdens on the practice of an inmate's religion by preventing him from engaging in

20   conduct which he sincerely believes is consistent with this faith.  *Shakur v. Schriro*, 514 F.3d 878,

21   884-885 (9th Cir. 2008).

22   "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid

23   if it is reasonably related to legitimate penological interests."  *Id.* (citing *Turner v. Safley*, 482 U.S.

24

25   [13]  Plaintiff argues that Defendant Myers, as the Community Resource Manager and Religious Review Committee
     Member, oversaw all policies related to religion.  Pl.'s Decl. ¶ 10.  Again, Plaintiff has no foundation to offer such an
26   opinion.  The exhibits he cites do not support his statement.

27   [14]  Plaintiff argues that Defendant Trimble did read and review both appeals, though his cited exhibits do not support
     such a contention.  Plaintiff has not set forth any indication that he has personal knowledge of what Defendant Trimble
28   did or did not read.

     [15]  In his disputed facts, Plaintiff states that "Defendant Fisher is still responsible for 2009 position he took as Associate
     Warden."  ECF No. 161, at 34.  This is not a fact, however, and does not render Defendants' fact disputed.

78, 89 (1987)).  *Turner* sets forth four factors to be balanced in determining whether a prison

regulation is reasonably related to legitimate penological interests:  (1) Whether there is a valid,

rational connection between the prison regulation and the legitimate governmental interest put

forward to justify it; (2) Whether there are alternative means of exercising the right that remain open

to prison inmates; (3) Whether accommodation of the asserted constitutional right will impact guards

and other inmates, and the impact on the allocation of prison resources generally; and (4) Whether

there is an absence of ready alternatives versus the existence of obvious, easy alternatives.  *Turner*,

482 U.S. at 89-90.

    B.    Conduct Consistent with Faith

        Plaintiff emphasizes in his opposition that his claim is related only to "the denial of chapel

access to engage in group services."  ECF No. 163, at 2.  Inherent in Plaintiff's argument is his belief

that his faith requires indoor group worship.

        Defendants attempt to question Plaintiff's belief, arguing that he provides no evidence to

show that indoor group worship is a component of Buddhist religious practices.  However, this Court

may not engage in such an analysis.  *See Shakur*, 514 F.3d at 884-85 (the plaintiff need not show that

the religious practice at issue is required as a central tenet of the religion, only that he believes that

the practice is consistent with his faith).  Here, Plaintiff states that he converted to Buddhism in

2003, and that his group practice "is to engage in group meditation and chanting in the chapel every

week when available by chapel schedule."  Pl.'s Decl. ¶ 1.[16]  He also alleges in his verified Third

Amended Complaint that his Buddhist faith requires meditation, chanting and prostration in an

indoor space.  ECF No. 51, at 7.  These statements are sufficient to show a sincerely held belief, and

there is no dispute that on certain occasions, Plaintiff did not have access to an indoor space for

group worship.  The Court therefore turns to the question of whether the denial of access to these

group religious services was reasonably related to legitimate penological interests.  *See O'Lone*, 482

U.S. at 349 (citing *Turner,* 482 U.S. at 89)).

///

---

[16]  Defendants' objection to this statement in his declaration as unsupported is overruled.  Plaintiff's declaration is
sufficient, and he need not provide additional evidence to show that conduct is mandated by his faith.

1          C.          Chapel Access- 2009 through 2012

2          In this claim, Plaintiff contends that between 2009 and 2012, Defendant McGee failed to

3   appear to supervise scheduled chapel times.[17]  He further contends that Defendants did not provide

4   any indoor accommodations to engage in group services, or permit unsupervised chapel access.

5          The first *Turner* factor asks whether there is a valid, rational connection between the prison

6   regulation and the legitimate governmental interest put forward to justify it.  It is undisputed that

7   inmates cannot use the chapel without supervision, and that such a rule is required for the safety and

8   security of staff, other inmates and the institution.  Prison security is unquestionably a legitimate

9   security interest.  *See Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir.2008) (finding

10  prison security to be a compelling interest under RLUIPA).  Indeed, the Ninth Circuit has recognized

11  that unsupervised religious services pose security threats to the prison system.  *See Anderson v.*

12  *Angelone*, 123 F.3d 1197, 1199 (9th Cir.1997) ("Nevada's prohibition on inmate-led religious

13  services does not violate the First Amendment."); *see also Mootry v. Flores,* 2015 WL 5178376, *9

14  (E.D.Cal. 2015); *Davis v. Flores*, 2013 WL 969151, *1 (E.D.Cal. 2010).

15         Plaintiff contends that Defendants permit Muslim and Jewish inmates to have unsupervised

16  chapel access, and that this contradicts their claim that inmates must be supervised in the chapel at

17  all times.  As explained above, however, Plaintiff's evidence does not support his claim, and it

18  remains undisputed that inmates are not permitted chapel access without supervision.

19         Plaintiff also suggests that Defendants' argument fails because they did not set forth "what

20  CDCR policy requires supervision in the chapel…"  ECF No. 163, at 43.  Defendants have presented

21  the testimony of Defendant Trimble (Chief Deputy Warden and Associate Warden during the time at

22  issue), Defendant Myers (Acting Community Resource Manager) and Defendant Fisher (Associate

23  Warden for Central Operations), who all conclude that inmates are not permitted in the chapel

24  without supervision out of concern for the safety of staff, other inmates and the institution.  They

25  also indicate that Title 15 requires constant supervision.  Trimble Decl. ¶ 9; Myers Decl. ¶ 9; Fisher

26  Decl. ¶ 11.  The Court will defer to the judgment of prison authorities, and rejects Plaintiff's

27  _____

[17]  Plaintiff does not provide an estimate of the number of times he was not able to attend chapel because of Defendant
28  McGee's failure to supervise the services.  He simply states that it occurred from 2009-2012.  Defendant McGee admits
    that "there were occasions" that he was not able to supervise chapel services.  McGee Decl. ¶ 3.  The Court must view all
    evidence in a light most favorable to Plaintiff, and therefore finds that Plaintiff satisfied his burden of showing a
    substantial burden.

1  argument that a specific policy must be offered.  See *Standing Deer v. Carlson,* 831 F.2d 1525, 1528

2  (9th Cir.1987) (prison officials not required to demonstrate that the prisoners' religious practices are

3  causally related to existing institutional problems; court restricts inquiry to considering whether the

4  challenged regulation is logically connected *to* legitimate penological concerns).

5       The second *Turner* factor, whether there are alternative means of exercising the right that

6  remain open to Plaintiff, also weighs in favor of Defendants.[18]  Initially, Plaintiff does not appear to

7  allege that Defendant McGee missed *all* chapel sessions during the years at issue, so it is likely that

8  he did have access to the chapel at times, and was able to perform his group worship indoors.  In any

9  event, it is undisputed that Plaintiff was permitted to chant and meditate on the yard, and he testified

10  that there was nothing that he could do in the chapel that could not be done on the yard.  Plaintiff

11  testified that the meditations and chants were the same, whether performed in the chapel or on the

12  yard, and that he often used the yard for services.  Plaintiff was also able to practice his individual

13  worship in his cell at all times.  *See Chau v. Young*, 2014 WL 4100635 (N.D.Cal. 2014) ("The denial

14  of access to group religious services did not deprive Chau of all means of exercising his religious

15  beliefs . . .Chau remained able to worship alone in his cell and had access, upon request, to Islamic

16  services to discuss spiritual matters"); *Robins v. Lamarque*, 2008 WL 744816 at *3-4 (N.D.Cal.

17  2008) (denial of Muslim group prayer services for approximately seven months due to violent threats

18  and security concerns did not violate the First Amendment, based in part on the fact that inmate was

19  free at all times to worship in his cell).

20       Plaintiff attempts to avoid this by arguing that inmates could contract Valley Fever on the

21  yard, and that the yard was not a safe place.  However, as explained above, the fact remains that

22  despite his worries, he was able to use the yard for chanting and meditating.  Plaintiff does not

23  present any evidence to suggest that concerns of a possible attack were anything more than

24  speculative.      The third *Turner* factor examines the impact that accommodation of the asserted

25  constitutional right would have on guards and other inmates, and on the allocation of prison

26  resources generally.  It is undisputed that a 2010 hiring freeze, combined with PVSP's over-capacity

27  status, resulted in a staff shortage.  By 2010, only two of the five chaplain positions at PVSP were

---

[18] Plaintiff suggests that the alternate means must involve *group* worship.  The Court does not read *Turner* this narrowly, however.

filled, and by 2012, Defendant McGee was the only chaplain left at PVSP.  This means that Defendant McGee was responsible for the religious needs of all inmates on five different yards. Defendants did not cause or create the shortages.  In fact, Defendants McGee and Myers tried to find people to volunteer, but it was difficult to recruit people to assist at PVSP.  While there were occasions when Defendant McGee did not supervise chapel services, this only occurred when the program was cancelled by staff, he had an unavoidable conflict in duties or he was not working at the time of services.  Moreover, a correctional officer position was not assigned to the Facility A chapel, and Defendants had nothing to do with these assignments.  Given these circumstances, it would have been impracticable and nearly impossible to ensure that Plaintiff had access to the chapel during every scheduled service time.

Plaintiff cites Operations Procedure 107, and contends that Defendants were responsible for enforcing the policy, and therefore ensuring that religious services continued in times of staff shortages.  Operations Procedure 107 addresses program modifications when a staff shortage exists to ensure that critical posts are filled.  As would be expected in a prison setting, "emergency response shall remain the highest priority," and "overall impact to daily operations shall be kept to a minimum and academic and vocation classes shall continue, if possible."  ECF No. 23-5, at 3.  The policy further explains that "Medical, dental, psychiatric and religious services shall continue." Plaintiff reads Operations Procedure 107 as mandating that religious services must be conducted even in instances of staff shortages, but the statement, taken in the context of the purpose of the policy, does not *require* anything.  Rather, it prioritizes the prison's functions and sets out how modifications should be implemented.  Operations Procedure 107 certainly does not, as Plaintiff suggests, require staffing of the Facility A chapel at all times.

Finally, under the fourth and final *Turner* factor, whether the regulation is an "exaggerated response" to the prison's concerns, Plaintiff must show there are "obvious, easy alternatives" to the regulation that "fully accommodate [his] rights at *de minimis* cost to valid penological interests." *Turner*, 482 U.S. at 90-91.  It is Plaintiff's burden to show that there are obvious and easy alternatives to the challenged policy.  *See Mauro v. Arpaio*, 188 F.3d 1054, 1061 (9th Cir. 1999). The proper inquiry is "whether the prisoner has pointed to some obvious regulatory alternative that

1   fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid

2   penological goal." *Overton v. Bazzetta*, 539 U.S. 126, 135-36 (2003).

3       Plaintiff has failed to meet this burden.  While he suggests that Defendants could permit

4   unsupervised access to the chapel, this is far from an "obvious and easy" alternative with *de minimus*

5   cost to valid penological goals.  He also suggests that Defendants had the ability to force Defendant

6   McGee, or other officers, to supervise the Facility A chapel.  Again, however, suggesting that staff

7   cover the Facility A during times of staff shortages is not an obvious and easy alternative, and has

8   more than *de minimus* cost to valid penological goals.

9       Plaintiff has therefore failed to raise a genuine dispute of material fact as to whether the

10   policy against unsupervised chapel access was reasonably related to legitimate penological interests,

11   and Defendants are entitled to summary judgment on the issue.

12       To the extent that Plaintiff names Defendants in their capacity as appeal reviewers, there can

13   be no such liability where there is no underlying constitutional violation.

14       D.       Chapel Access on C-Status

15       Plaintiff next argues that Defendants implemented an "underground" policy that "prohibited

16   C-Status access to group services, and the ability to exercise his religion in a group indoors" at the

17   chapel.  ECF No. 163, at 2.

18       As an initial matter, the Court questions whether, as a matter of law, the temporary nature of

19   this claim constitutes a substantial burden on Plaintiff's religious practices.  As a result of Plaintiff's

20   placement on C-Status, he was not permitted to attend Buddhist group services for roughly five

21   weeks in 2009, and four months in 2011.  Plaintiff missed two services per week during these time

22   periods, suggesting that the policy led to "relatively short-term and sporadic" intrusions that do not

23   amount to a substantial burden.  *See Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998)

24   (affirming summary judgment on claim that defendant violated Free Exercise Clause by interrupting

25   inmate's prayer time no more than eighteen times over the course of two months because it was

26   "relatively short-term and sporadic," and not a "substantial burden").

27       Even assuming that Plaintiff has shown a substantial burden, he cannot satisfy his burden

28   under *Turner*.  The first *Turner* factor, whether there is a valid, rational connection between the

13

1    prison regulation and the legitimate governmental interest, weighs strongly in favor of Defendants.

2    It is undisputed that C-Status inmates have had repeated program failures, and have been found to

3    present a threat to the safety and security of prison staff, other inmates and/or the institution.  As a

4    result, C-Status restrictions are designed to limit their movements.  In this regard, while C-Status

5    inmates are given one hour of yard time, CDCR policy otherwise prohibits individual release to

6    attend chapel times.  If chapel time does not overlap with the yard time, C-Status inmates are not

7    released from their cell at other times.  A valid, rational connection therefore exists between the

8    policy and the prison's interest in security and safety.

9        Plaintiff suggests that C-Status prisoners do not present a security risk for various reasons,

10   but as discussed above, his is unable to create a dispute of fact on the issue.  Again, the Court will

11   not question the judgment of those who operate the prison where there is no evidence to undermine

12   their actions.

13       Plaintiff also argues that some C-Status prisoners on other yards are able to attend their

14   scheduled chapel time, showing that the policy is not applied evenly.  This ability, however, is only

15   because their yard time and chapel time coincidentally overlap.  In other words, the policy remains

16   applicable, but it may not impact all prisoners in the same way.

17       The second *Turner* factor also weighs in favor of Defendants.  As was the case with

18   Plaintiff's chapel access claim, it is undisputed that Plaintiff was permitted to chant and meditate on

19   the yard, and he testified that there was nothing that he could do in the chapel that could not be done

20   on the yard.  Plaintiff testified that the meditations and chants were the same, whether performed in

21   the chapel or on the yard, and that he often used the yard for services.  Plaintiff was also able to

22   practice his individual worship in his cell at all times, and he could have requested the services of a

23   chaplain to tend to his specific religious needs.  Plaintiff was therefore left with numerous alternative

24   means to practice his religion.

25       Third, accommodating Plaintiff's desire to attend chapel while on C-Status would have

26   required officers to release him individually from his cell during times that did not coincide with

27   yard time, and to ensure that he was taken back to his cell at the conclusion of chapel.  Again, it is

28   undisputed that there was a staff shortage during this period, and that PVSP was over capacity.

                                         14

1    Under these circumstances, making accommodations for Plaintiff would negatively impact the

2    allocation of PVSP's resources.

3         Plaintiff argues that Defendants have permitted other inmates to leave their cells at times that

4    did not coincide with yard times, but he has not set forth evidence to support his contention.

5         Finally, under the fourth *Turner* factor, Plaintiff suggests that Defendants could have

6    changed his yard time to overlap with his chapel time.  Given the staff shortage and number of

7    prisoners at PVSP, suggesting that C-Status yard times be altered to ensure that the yard time

8    overlaps with the chapel time preferences of one prisoner it is not an "obvious, easy" alternative.  It

9    is undisputed that the staff shortages and number of prisoners made it difficult to accommodate

10   special requests of inmates, especially those on C-Status subject to additional security-related

11   restrictions.

12        Plaintiff has therefore failed to create a genuine dispute of material fact as to whether the C-

13   Status policy was reasonably related to legitimate penological interests, and Defendants are entitled

14   to summary judgment on the issue.

15        To the extent that Plaintiff names Defendants in their capacity as appeal reviewers, there can

16   be no such liability where there is no underlying constitutional violation.

17        E.    Qualified Immunity

18        Government officials enjoy qualified immunity from civil damages unless their conduct

19   violates "clearly established statutory or constitutional rights of which a reasonable person would

20   have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two

21   important interests - the need to hold public officials accountable when they exercise power

22   irresponsibly and the need to shield officials from harassment, distraction, and liability when they

23   perform their duties reasonably," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), and protects "all

24   but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S.

25   335, 341 (1986).

26        In resolving a claim of qualified immunity, courts must determine whether, taken in the light

27   most favorable to the plaintiff, the defendant's conduct violated a constitutional right, and if so,

28   whether the right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Mueller v.*

15

*Auker*, 576 F.3d 979, 993 (9th Cir. 2009).  While often beneficial to address in that order, courts have discretion to address the two-step inquiry in the order they deem most suitable under the circumstances.  *Pearson*, 555 U.S. at 236, 129 S.Ct. at 818 (overruling holding in *Saucier* that the two-step inquiry must be conducted in that order, and the second step is reached only if the court first finds a constitutional violation); *Mueller*, 576 F.3d at 993-94.

As the Court has found that no constitutional violation occurred in the first instance, it will not further address qualified immunity.

## V.    FINDINGS AND RECOMMENDATIONS

Based on the foregoing, the Court HEREBY RECOMMENDS that the motion for summary judgment filed by Defendants Myers, McGee, Fisher and Trimble be GRANTED, and that judgment be entered in their favor.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being served with these Findings and Recommendations, the parties may file written objections with the Court.  Local Rule 304(b).  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections must be filed within fourteen (14) days from the date of service of the objections.  Local Rule 304(d).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __April 19, 2016__                    _____/s/ Sandra M. Snyder__
                                                      UNITED STATES MAGISTRATE JUDGE

16